# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | |
|---|---|
| SCOTT WELDON, Derivatively and on Behalf of Nominal Defendant, HCP, INC., | ) ) ) Case No. 3:17-cv-755 |
| Plaintiff, | ) ) |
| vs. | ) ) ) |
| LAURALEE MARTIN, THOMAS M. HERZOG, MICHAEL D. MCKEE, BRIAN G. CARTWRIGHT, CHRISTINE N. GARVEY, DAVID B. HENRY, JAMES P. HOFFMAN, PETER L. RHEIN, JOSEPH P. SULLIVAN, and HCR MANORCARE, INC. | ) **VERIFIED SHAREHOLDER** ) **DERIVATIVE COMPLAINT** ) ) ) ) ) ) |
| Defendants, | ) ) ) |
| and | ) ) |
| HCP, INC., | ) ) |
| Nominal Defendant. | ) ) |

By and through undersigned counsel, Plaintiff Scott Weldon ("Plaintiff") brings this shareholder derivative action on behalf of Nominal Defendant HCP, Inc. ("HCP" or the "Company") and against certain officers and/or directors of the Company for breaches of fiduciary duties. Plaintiff alleges upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, which includes, without limitation, review and analysis of public filings with the United States Securities and Exchange Commission ("SEC"), news articles and shareholder communications, press releases and other publications disseminated by the Company, postings on HCP's website concerning

1

the Company's public statements, and pleadings, papers, and any documents filed with and publicly available from the related pending federal securities class action, *Boynton Beach Firefighters' Pension Fund v. HCP, Inc.*, Civil Action No. 3:16-cv-1106 (the "Securities Action").  Plaintiff believes that through reasonable discovery, substantial additional evidence will exist for the allegations and claims set forth herein.

## SUMMARY OF THE ACTION

1.      This is a shareholder derivative action on behalf of Nominal Defendant HCP seeking to recover damages caused by Defendants' breaches of fiduciary duty and violations of §14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder as a result of the wrongdoing committed by HCP's officers and directors from March 30, 2015 and continuing to the present (the "Relevant Period").  HCP and its shareholders continue to suffer as the wrongdoing alleged herein is ongoing.

2.      Nominal Defendant HCP became a public company in 1985 and is a real estate investment trust ("REIT") that invests primarily in real estate pertaining to the healthcare industry in the United States.  The Company acquires, develops, leases, manages and disposes of healthcare real estate, as well as provides financing to various healthcare providers.  The Company's portfolio is constructed of investments in senior housing, post-acute/skilled nursing, life science, medical offices, and hospitals.

3.      The largest portion of the Company's revenues come from the post-acute/skilled nursing segment of its business.  The facilities in this segment – often referred to as "SNFs" – offer restorative, rehabilitative, and custodial nursing care for people that do not require complex treatment available at hospitals.  Additional revenues from sub-acute care services are made from services to residents beyond room and board, including occupational, physical, speech,

respiratory, and intravenous therapy, wound care, oncology treatment, brain injury care and orthopedic therapy, as well as sales of pharmaceutical products and other services. Some of the Company's SNFs provide the listed services on an out-patient basis. Post-acute/skilled nursing services provided by the Company's operators and tenants in its facilities are mainly paid for privately or through Medicare and Medicaid programs.

4. Prior to the start of the Relevant Period, the Company acquired ManorCare on April 7, 2011. ManorCare, through its subsidiaries, owned, operated, and managed SNFs. When it was acquired by the Company, ManorCare operated 268 SNFs and 66 assisted living facilities spread across 30 states.

5. At the same time of the acquisition, the Company entered into a long-term, triple-net master lease agreement with ManorCare. The agreement was supported by a guaranty from ManorCare through which a wholly-owned subsidiary of ManorCare would be charged with operating the leased facilities. In addition to acquiring ManorCare, the Company exercised an option to purchase an interest in the operations of ManorCare, a 9.9% equity interest at the time of closing. ManorCare would be HCP's largest tenant, with nearly 30% of the Company's revenue coming from its leases with ManorCare during the Relevant Period. In fact, almost 40% of HCP's real estate assets were subject to long-term leases with ManorCare. As a result, ManorCare had a significant impact on the Company's operations and was of vital importance to HCP investors.

6. At all times through the Relevant Period, Defendants misrepresented the financial status and performance of ManorCare, and falsely assured investors that the Company's ManorCare assets, leases and revenue derived therefrom were secure and unimpaired. According to statements issued by both HCP and ManorCare, ManorCare appeared to be in

3

stable financial condition, making it a suitable and reliable partner for the Company. As ordered by the Securities and Exchange Commission (the "SEC"), beginning on May 24, 2013, the Company separately disclosed ManorCare's own audited financial results in Company filings with the SEC, and represented that ManorCare's financials were prepared in full compliance with U.S. generally accepted accounting principles ("GAAP"). Even more, the Company and ManorCare represented that ManorCare had "a long history of compliance with regulations," that its billing practices had been "audited" in the past, and were "to the standard one would want."

7.     In reality, throughout the Relevant Period, Defendants were aware or recklessly ignored the fact that ManorCare was engaged in rampant insurance fraud, which allegedly generated **over $6 billion dollars** in false claims submitted to government programs. Specifically, to ensure that it would receive a daily reimbursement from Medicare at the highest possible level, ManorCare submitted false claims for reimbursement for therapeutic services that didn't meet the requisite criteria for such services.

8.     In order to maximize the reimbursement payments, ManorCare systemically forced patients to remain in therapy for longer than was necessary to resolve their respective conditions. This fraudulent practice subjected patients to unnecessary, unreasonable, and sometimes even harmful treatment. One method by which ManorCare fraudulently increased patients' therapy time and associated billings was to combine patients together and subject them to unnecessary group therapy.

9.     The above and other fraudulent practices subjected ManorCare to three different whistleblower lawsuits, which were filed under seal in the United States District Court for the Eastern District of Virginia in 2009 and 2011, of which the Individual Defendants were well aware, but did not disclose to shareholders.

4

10.     As a result of the above described illegal practices, the United States Department of Justice (the "DOJ") commenced an investigation into ManorCare,[1] which culminated in the DOJ's intervention in the whistleblower lawsuits on April 10, 2015.  The intervention led to the public disclosure and unsealing of the whistleblower complaints.

11.     Throughout the Relevant Period, the Company's shareholders and the investing public in general were under a false impression of the Company's business prospects due to the false and misleading information disseminated by the Individual Defendants.  In breach of their fiduciary duties owed to the Company, the Individual Defendant willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact concerning, *at least*, that: (i) ManorCare was engaged in insurance fraud, in violation of both federal and state law; (ii) ManorCare's reported revenue and earnings were falsely stated due to the fraudulently-obtained reimbursements; (iii) ManorCare's consolidated financial statements were not in compliance with GAAP; and (iv) ManorCare's billing fraud and the DOJ's action against ManorCare put the Company's lease revenue stream from ManorCare in jeopardy, and called into question the value of HCP's ManorCare real estate assets and HCP's equity stake in ManorCare.  Due to Defendants' false statements and fraudulent course of conduct, HCP's stock traded at artificially inflated prices during the Relevant Period.

12.     These facts involved the Company's business, operations, and prospect, and as such, were known to the Individual Defendants or were recklessly disregarded by them.  The statements and representations made by the Company referenced herein were materially false and misleading at all times through the Relevant Period.  At no point did the Individual

---

[1] The DOJ's complaint in intervention is captioned *United States of America, ex rel. Ribik, Carson, and Slough v. HCR ManorCare, Inc., ManorCare Inc., HCR ManorCare Services, LLC and Heartland Employment Services, LLC* (Civil Action Numbers: 1:09cv13; 1:11cv1054; 1:14cv1228 (CMH/TCB)).

Defendants attempt to correct the false and/or misleading statements and/or omissions of material fact described herein, rendering them personally liable to the Company for breaching their fiduciary duties.

13.     Despite the Company's knowledge of the existence of the whistleblower lawsuits brought against ManorCare (brought as early as 2009), it was not until nearly six years later, on April 21, 2015, when the truth began to be revealed to the general public, that the Company finally disclosed through a press release that the whistleblower lawsuits existed, that a consolidated whistleblower complaint had been filed, and that the DOJ had intervened in the actions.  Moreover, this was the first time in which the Company recognized the existence of the whistleblower lawsuits to investors.  Defendants, however, downplayed the DOJ's actions, continuing to conceal from investors the full truth of the severity of the DOJ's claims against ManorCare.

14.     On May 5, 2015, the Company filed a quarterly report on a Form 10-Q with the SEC, in which the Company again disclosed information regarding the DOJ's intervention in the whistleblower lawsuits to investors.  Further, the Company revealed that it had recorded a non-cash impairment charge of $478 million related to some of its lease arrangements with ManorCare, stating that the impairment would reduce the carrying value of its ManorCare investments from $6.6 billion to $6.1 billion.  The market responded to the negative news with a 2.9% drop in the Company's stock price on the same day that the news was revealed.

15.     Despite the fact that the Company was facing significant negative consequences due to ManorCare's illegal conduct, Defendants continued to provide false hope to investors, stating that the DOJ's intervention in the whistleblower lawsuits would in no way impact ManorCare's profitability.  What's more, HCP denied that ManorCare had engaged in any

6

wrongdoing.

16.     On November 3, 2015, the trickle of information regarding the Company's problems continued.  HCP revealed another impairment charge, this time in the amount of $27 million related to its equity interest in ManorCare.  In light of the news, the Company's stock declined 2.6%.  Defendants again downplayed the reason for this impairment charge, stating that it was attributed to admissions trends and failed to disclose ManorCare's fraudulent practices and mounting pressure from the DOJ, which placed the Company's ManorCare investments at risk.

17.     The truth was fully revealed on February 9, 2016, when the Company disclosed that its equity in ManorCare had been written down to zero, that it had taken an $836 million non-cash impairment on its ManorCare lease assets, and that it placed all its ManorCare real estate assets on a "Watch List."  The Company also revealed that it could no longer count on ManorCare to pay rent, and therefore, had changed the way lease revenue from ManorCare was accounted to a "cash only" basis.  To make matters worse, the Company disclosed the ever-growing legal costs incurred by ManorCare in defending against the various lawsuits filed against it.  In response, the Company's stock plummeted 15% in one day, from $33.99 on February 8, 2016 to $28.33 the following day.

18.     As a result of the Individual Defendants' conduct, the Company has become subjected to the Securities Action, the need to undertake internal investigations, and losses due to the unjust enrichment of Individual Defendants who were improperly over-compensated by the Company despite their wrongful conduct alleged herein.

19.     The Company's Board of Directors cannot consider a demand to commence litigation against themselves on behalf of the Company, as a majority of them do not have the requisite level of disinterestedness and independence in light of their conduct, which has

subjected the Company to the Securities Action.

20.     The Company and its shareholders have been substantially damaged as a result of Defendants knowing or highly reckless breaches of fiduciary duty and other misconduct alleged herein.

### JURISDICTION AND VENUE

21.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because claims arise under and pursuant to §14(a) of the Exchange Act (15 U.S.C. §78n(a)) and Rule 14a-9 promulgated there under (17 C.F.R. §240.14a-9).

22.     The Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a) as they relate to Plaintiff's claims under 15 U.S.C. §78n(a).

23.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2), because a substantial portion of the wrongs, transactions and acts complained of occurred herein, including Defendants' involvement in those wrongs, as detailed herein. Defendants have received substantial compensation in this District by engaging in business here, which has and will continue to have a substantial effect in this District.

### THE PARTIES

24.     Plaintiff is a current shareholder of HCP.  Plaintiff has been at all relevant times a shareholder of HCP common stock and has continuously held HCP common stock through the present date.

25.     Nominal Defendant HCP is a Maryland corporation with its principal executive offices located at 1920 Main Street, Suite 1200, Irvine, California 92614.  The Company's common stock trades on the New York Stock Exchange ("NYSE") under the symbol "HCP."

26.     Defendant HCR ManorCare, Inc. ("ManorCare"), is a Delaware corporation with

8

its principal executive offices located at 333 N. Summit St., Toledo, Ohio 43604.  ManorCare is a provider of healthcare services that owns and operates skilled nursing and rehabilitation centers, assisted living facilities, memory care facilities, hospice and home care agencies, and outpatient rehabilitation clinics.

27.     Defendant Lauralee Martin ("Martin") was an HCP director from 2008 until July 11, 2016 and the Company's Chief Executive Officer from October 2013 until July 11, 2016. Additionally, Defendant Martin served as the Chair of the Long-Range Planning Committee. Prior to her departure from the Company, Defendant Martin received $6,878,736 in total compensation for fiscal year 2015.

28.     Defendant Thomas M. Herzog ("Herzog") is a member of the Company's board has been the Company's Chief Executive Officer since January 2017 and was the Company's Chief Financial Officer from June 2016 to December 2016.  Upon information and believe, Defendant Herzog receives a substantial annual salary in his role as Chief Executive Officer, representing the primary source of his income.

29.     Defendant Michael D. Mckee ("Mckee") has been the Company's Executive Chairman since May 2016 and has been a director since 1989.  Defendant Mckee served as interim President and Chief Executive Officer from July 2015 to December 2016.  Defendant Mckee received $311,726 in total compensation for fiscal year 2015.

30.     Defendant Brian G. Cartwright ("Cartwright") has been a director of the Company since 2013.  Defendant Cartwright is also currently the chair of the Company's Audit Committee.  Defendant Cartwright received $206,040 in total compensation for fiscal year 2015.

31.     Defendant Christine N. Garvey ("Garvey") has been a director of the Company since 2007.  Defendant Garvey is a member of the Company's Audit Committee as well as the

Nominating and Corporate Governance Committee and is the chair of the Compensation Committee.  Defendant Garvey received $225,768 in total compensation for fiscal year 2015.

32.     Defendant David B. Henry ("Henry") has been a director of the Company since 2004.  Defendant Henry is listed as the Board's "Lead Independent Director," is the chair of the Nominating and Corporate Governance Committee, and member of the Compensation Committee.  Defendant Henry received $216,298 in total compensation for fiscal year 2015.

33.     Defendant James P. Hoffman ("Hoffman") has been a director of the Company since 2014.   Defendant Hoffman is a member of the Company's Audit Committee and Nominating and Corporate Governance Committee.  Defendant Hoffman received $200,476 in total compensation for fiscal year 2015.

34.     Defendant Peter L. Rhein ("Rhein") has been a director of the Company since 1985.  Defendant Rhein is a member of the Company's Audit Committee and Compensation Committee.  Defendant Rhein received $201,332 in total compensation for fiscal year 2015.

35.     Defendant Joseph P. Sullivan ("Sullivan") has been a director of the Company since 2004.   Defendant Sullivan is a member of the Company's Compensation Committee.  Defendant Sullivan received $198,010 in total compensation for fiscal year 2015.

## SUBSTANTIVE ALLEGATIONS

### The Company's Acquisition of ManorCare

36.     The Company acquired substantially all of the real estate assets of ManorCare on April 7, 2011, for approximately $6 billion.  Pursuant to that deal, HCP exercised an option to acquire a 9.9% equity interest in ManorCare for $95 million.

37.      At the same time of the acquisition's close, the Company entered into a triple net Master Lease agreement with ManorCare.  The terms of the agreement governed 268 SNF

facilities, among others, that the Company acquired from ManorCare in its acquisition.  Under the terms of the lease, ManorCare would be obligated to pay the Company minimum rent in the first year in the amount of $472.5 million.  The revenue gained from the agreement was of the utmost importance for the Company, as rental revenue paid by ManorCare constituted nearly 30% of HCP's total revenue during the Relevant Period.

### ManorCare's Fraudulent Billing

38.     As revealed in the whistleblower and DOJ complaints, ManorCare SNFs were eligible for "reimbursements" from Medicare for providing rehabilitation therapy to patients at its facilities.  The reimbursement program used a scale to determine the amount given back to programs, with the highest possible "Ultra High" level applying toward patients who were in need of skilled rehabilitation therapy for a minimum of 720 minutes per week from at least two different therapy disciplines.

39.     From 2006 to 2012, ManorCare subjected patients to unnecessary and harmful therapy in order to ensure that it would receive reimbursements from Medicare at the "Ultra High" level.  For instance, as alleged in the whistleblower and DOJ actions, Patient C was an 84-year old that was admitted to one of the SNF ManorCare facilities in Illinois.  In 30 days spent at the facility, his health began to dramatically decline, resulting in his physician ordering palliative care and comfort treatment only.  ManorCare therapists ignored the physician's orders and protests made by Patient C, and attempted to provide him with therapy services up until the day he died.  This was done in a shocking attempt to meet ManorCare's "Ultra High" billing targets in order to improperly increase ManorCare's revenue stream.

40.     Yet another example of ManorCare's fraudulent maintenance of the "Ultra High" Medicare reimbursement was to force patients to remain in therapy for longer than was

necessary for their respective conditions.  ManorCare had policies in place specifically to maximize the length of patients' stays at SNFs, regardless of what the actual needs of the patients were.  For instance, before releasing a beneficiary who had been in one of the SNFs for at least 35 days, therapist were required to first contract their Regional Rehabilitation Manager to discuss how they could keep the patient in the facility longer.  The beneficiary would also need to receive the approval of a ManorCare "Medicare Operations Specialist" prior to being discharged.  This policy was designed with the primary goal of "assur[ing] that you maximize coverage for each resident/patient . . . ."  One therapist who left ManorCare in 2007 complained to ManorCare, stating **"[y]ou're ripping off the patients and families with absolutely [sic] concern as to how your keeping patients as long as possible is financially impacting the families. . . . Your practices border on fraud and you need to be investigated by Medicare."**

41.     ManorCare had no tolerance for employees who disagreed with its fraudulent practices.  Therapists who voiced such an opinion would suffer serious repercussions, up to termination of employment.  For instance, as alleged by the DOJ in its complaint, ManorCare's Division Rehabilitation Director Rick Grahn sent an email to ManorCare's Vice President of Reimbursement, Barry Lazarus, on March 10, 2009, stating: "If therapists suggest planned levels of therapy delivery that are anything other than ultra high, they are labeled as 'uncooperative.'"

42.     This fraudulent scheme conducted by ManorCare increased the number of rehabilitation days that ManorCare billed at the "Ultra High" level dramatically.  As alleged in both the whistleblower and DOJ actions, in October 2007, ManorCare's Arlington, Virginia SNF billed 33.6% of its rehabilitation days at the "Ultra High" level.  In fact, by April 2012, that same facility had increased the percentage of rehabilitation days billed at the "Ultra High" level to 85%.  In total, ManorCare generated over $6 billion in false claims from Medicare from 2006 to

2012.

**The Company's Relationship with ManorCare**

43.     By April 7, 2011 when HCP's acquisition of substantially all of ManorCare's real estate assets and its 10% equity interest in ManorCare was complete, the Company had engaged in due diligence of ManorCare and its operations. Due diligence such as the kind the Company engaged in would have most certainly revealed the sealed whistleblower complaints filed against ManorCare in 2009 and 2011 concerning ManorCare's fraudulent billing practices. As then-CEO James F. Flaherty III stated on the Company's December 14, 2010 earnings conference call:

> We have been in on-again/off-again and on-again/off-again discussions for well over a year at this point. … ***At this point, we know each other very well.  We are very well versed in terms of the company's [ManorCare's] business strategy, business model, our respective teams.*** I am not sure there has been more than a couple weeks where there haven't been some significant interactions. … [I]t has been a 15-month plus dialogue.

44.     The Company emphasized its close relationship with its "partner" ManorCare in statements made to investors.  On a February 14, 2012 conference call detailing the earnings for the fourth quarter of 2011 and year-ended December 31, 2011, then-CEO Flaherty stated that "our primary post-acute care partner, [ManorCare], continued to perform well."  Flaherty went on to state that "we feel obviously very, very good with the operating partner that is [ManorCare].  And, we work with them very, very closely."

45.     During the same February 14, 2012 conference call, Flaherty stated "[ManorCare] has been proven over many cycles to be the low cost provider for a wide variety of post-acute care patients requiring short-term rehabilitation, that augers well for that platform.  And, by extension our real estate portfolio.  And, by extension our [equity] investment in [ManorCare]."  This type of statement further highlighted the close relationship between the two

companies, and ManorCare's importance to HCP's financial outlook.

46.     The importance of ManorCare's financial well-being was stated in the Company's communications and filings with the SEC as well.  For instance, on May 3, 2013, the Company sent a letter to the SEC explaining that "given the significance of [HCP's] relationship with [ManorCare]," the Company provided shareholders with supplemental information packages which included the Company's aggregate investments with ManorCare and other ManorCare financial performance metrics.  HCP further stated that such information was "the principal focus of questions we received from investors and analysts on our earnings calls."

47.     As a result of the importance of ManorCare to the Company, the SEC in May 2013 instructed the Company to go beyond the summary information concerning ManorCare's earnings that HCP had provided in the past.  Instead, the SEC stated that the Company would need to provide audited financial statements of ManorCare.  The Company was instructed to amend its annual filing with the SEC to provide for these statements.  Pursuant to these orders, on May 24, 2013, the Company separately disclosed ManorCare's own audited financial results in its annual statement.

**Defendants' False and/or Misleading Statements During the Relevant Period**

48.     Throughout the Relevant Period, Defendants misrepresented the financial status and performance of ManorCare and falsely assured investors that the Company's ManorCare assets, leases and revenue derived therefrom were secure and unimpaired.

49.     The false and misleading statements resulted in the artificial inflation of the Company's stock price, while in reality HCP was facing significant undisclosed problems.

50.     On March 30, 2015, the Company filed a Form 8-K with the SEC and released a press release stating that HCP had amended its lease agreement with ManorCare to ensure that

ManorCare would be able to meet its obligations.  The press release stated, in pertinent part:

> "We appreciate our strong relationship with and continued support from HCP. This pivotal transaction will immediately improve our financial flexibility and allow us to continue to grow the [ManorCare] franchise," said Paul Ormond, Chairman, President and CEO of [ManorCare].  "HCP is an experienced capital partner that understands the challenges faced by our industry in the current environment."

> "The lease amendment directly addresses concerns regarding low coverage ratios on our [ManorCare] lease, and we believe that the benefits HCP receives represent a fair trade for our shareholders," said Lauralee Martin, President and CEO of HCP.  "This amendment not only results in improved lease coverage, but positions HCR for growth by ensuring that adequate capital is available to advance their strategic business initiatives including continued investment in our real estate portfolio."

51.     The statements made in the press release were false and misleading, since ManorCare's reimbursement billing fraud and the investigation by the DOJ put ManorCare's growth at grave risk and, as such, put the Company's lease revenue stream derived from its ManorCare assets at serious risk.  Moreover, these statements called into question the value of HCP's real estate assets and the Company's equity stake in ManorCare.

**Despite the Truth Beginning to be Emerge,
Defendants Continue to Make False and Misleading Statements**

52.     On April 10, 2015, the DOJ intervention in the whistleblower lawsuits caused the previously filed whistleblower complaints to be unsealed.  The allegations surrounding ManorCare's rampant billing fraud came to light for the first time.

53.     In a press release on April 21, 2015, the Company stated: "The United States intervened against [ManorCare] in the parts of the civil actions alleging that they submitted claims to Medicare for therapy services that were not covered by the skilled nursing facility benefit, were not medically reasonable and necessary, were not skilled in nature, and therefore not entitled to Medicare reimbursement."  The market reacted negatively to the news, with

HCP's stock declining from $43.33 to $42.85 on April 21, 2015.

54.     Instead of informing investors of the true nature of ManorCare's problems, the Company downplayed the DOJ's actions, and assured investors that ManorCare "intends to vigorously defend the DOJ's civil action." The Company also told investors that ManorCare was one of several SNF operators under investigation by the DOJ.

55.     The Company worked hand in hand with ManorCare in defending ManorCare against the accusations. On April 21, 2015, ManorCare posted information on its website echoing the Company's sentiments. ManorCare stated "[w]e believe this lawsuit is unjust, and we will vigorously defend ourselves in Court." ManorCare also indicated that it had produced information that "refute[d] the basic claims contained in the lawsuit."

56.     In reality, ManorCare was still actively engaged in its scheme to increase revenues through billing fraud. Furthermore, because the fraudulent scheme was an essential foundation of ManorCare's profitability, the DOJ action placed the Company's revenue stream derived from its ManorCare leases at serious risk.

57.     On May 5, 2015, the Company disclosed that it had recorded a non-cash impairment charge of $478 million relating to some of the lease arrangements that the Company had with ManorCare. The Company stated that this would result in the reduction of the carrying value of its ManorCare investments from $6.6 billion to $6.1 billion. The market reacted to the news negatively, with HCP's stock declining 2.9% over the course of a day, dropping from $40.75 to $39.55.

58.     Following the May 5, 2015 disclosure, on a conference call that same day, the Company reported that ManorCare had "completed a very positive first quarter," and that its results were ahead of ManorCare's budget for 2015. Moreover, the Company stated that the

DOJ's action against ManorCare would not negatively impact ManorCare's profitability. Specifically, then-CEO Defendant Martin stated "we do not anticipate a significant impact to [ManorCare's] profitability in the near future" and that she was not aware of "any potential revenue loss that the Company might have going forward."

59.     Despite the release of information regarding ManorCare's fraudulent scheme, the Company continued to represent to investors that ManorCare had not actually done anything wrong.  During the May 5, 2015 conference call, then-CEO Defendant Martin said the following:

> [T]he investigation by the Department of Justice has been ongoing for about three years. HCR has maintained their business practices throughout that time and, in fact, has continued to increase market share and provider relationships who are focused on the outcomes that they achieve in terms of think [sic] about hospital readmissions and so forth. I would also add that -- and we mentioned this on a prior call -- that in conjunction with winning some of those relationships, HCR actually had their billing practices -- and this was, again, several years ago -- audited by a CMS recommended audit firm, passed it, and felt that their practices are definitely to the standard that one would want.

60.     As Defendants were aware, ManorCare's billing practices were indeed fraudulent and not "to the standard that one would want."  ManorCare was still engaged in reimbursement billing fraud and in serious jeopardy due to the DOJ's action.  Moreover, the Company's revenue stream from ManorCare was in serious danger, and the value of its equity stake in ManorCare was called into question.

61.     The false and misleading "positive" information flowing from the Company provided analysts with the reassurance they needed regarding the Company's prospects and the impact of the DOJ action against ManorCare.

62.     More signs of trouble emerged on November 3, 2015, when the Company filed a Form 10-Q for the third quarter of 2015 with the SEC.  In the report, the Company disclosed that it had recorded yet another impairment charge of $27 million related to its interest in ManorCare.

The Company stated that the impairment was due to "a declining trend in admissions from hospitals and continuing trends in mix and length of stay driven by Medicare Advantage and from other managed care plans."  Nowhere did the company disclose that the impairment charge was also due to ManorCare's billing fraud, and the impact of the DOJ and whistleblower lawsuits in minimizing to some degree the ongoing massive fraud levels.

63.     Responding to the news, an analyst from BMO Capital noted that the impairment was a warning.  The news caused the Company's stock to decline, falling from $37.71 to $36.73 on that same day.

64.     The full truth of ManorCare's fraud and the Company's damage came to light on February 9, 2016, when the Company filed its Form 10-K annual report with the SEC for the year ended December 31, 2015.  The Company disclosed that it had now written its interest in ManorCare down to zero, and that it had taken an additional $839 million impairment charge on its ManorCare real estate assets.  In total, through the Relevant Period, the Company had written down those assets by over $1.3 billion, approximately 20% of their prior carrying value.  The Company noted that "the timing and amounts owed under the [ManorCare] [lease] investments are no longer reasonably assured."  Moreover, the Company revealed that legal fees associated with ManorCare's defending against the DOJ action were skyrocketing, reaching over $1 million per month.

65.     With investors and the market now learning the true outlook of the Company and its ManorCare investments, the Company's stock declined from $33.99 to $28.33 on February 9, 2016, a 17% drop in value.

66.     On March 17, 2016, the Company filed its proxy statement on Form DEF 14A with the SEC (the "2016 Proxy").  The 2016 Proxy included a section entitled "Compensation

Discussion and Analysis," which stated, among other things, the following regarding compensation awards based on the Company's performance:

> Our 2015 NEO compensation awards demonstrate our commitment to aligning executive pay with Company performance. Our short- and long-term incentive compensation is subject to rigorous objective, at-risk performance metrics. These metrics were set by our Compensation Committee for 2015 at the beginning of the performance year based on our annual budget and initial expectations of Company performance, as announced in February 2015. As described above under "Proxy Highlights—Performance Highlights," our overall 2015 results generally improved year over year but did not meet original performance expectations, primarily due to the impact of the Company's lease restructure transaction with HCRMC in March 2015. As a result of lower Company performance levels for 2015, our CEO's total compensation as reported in the Summary Compensation Table was lower for 2015 than for 2014 (her first full year as CEO), as illustrated below. Additionally, as discussed above under "Proxy Highlights—Pay-for-Performance Alignment," the PSUs granted to our NEOs over the last two years are expected to provide significantly lower realized pay compared to the grant date fair values reported in the Summary Compensation Table for the same years.

67.     The 2016 proxy indicated that the Company's incentive compensation was lower than for 2015 than for 2014 as a result of "the impact of the Company's lease restructure with [ManorCare] in March 2015."  However, the 2016 Proxy failed to disclose that a large part of the performance issues directly resulted from the rampant insurance fraud occurring at ManorCare, and the associated DOJ and whistleblower actions.  Accordingly, the 2016 Proxy omitted material information concerning the Company's true performance, which is tied directly to the directors' and officers' compensation.

68.     On July 11, 2016, the Company filed a current report with the SEC on form 8-K, in which it was revealed that Defendant Martin would be resigning from her position as CEO of the Company.  The Company provided no reason for Defendant Martin's resignation, with the Company merely stating "Ms. Martin's employment with the Company will terminate effective July 11, 2016."

69.     In conjunction with his resignation, the Compensation Committee proposed, and the Board approved, a severance package worth over $6 million.  According to the Company's current report filed with the SEC on Form 8-K on July 11, 2016, Defendant Martin will receive: (1) salary continuation in an aggregate amount equal to $6,000,000, less all applicable state and federal tax withholdings and other lawful deductions, payable in equal installments in accordance with the Company's normal payroll practice over a twenty-four (24) month period, provided that the payments that would otherwise be paid during the first six months following the Separation Date shall instead be paid on January 12, 2017, and the remaining payments shall be paid over the remaining eighteen (18) month period; (2) reimbursement of any COBRA premiums incurred for up to twenty-four (24) months following the Separation Date; (3) a lump sum payment of $10,000, less all applicable state and federal tax withholdings and other lawful deductions, representing transition-related expenses and payable within ten (10) days following the Separation Date; (4) continued directors' and officers' insurance coverage for six years following the Separation Date under the Company's existing or successor policy; and (5) the vesting of outstanding time-based and performance-based restricted stock units ("RSUs").

70.     The announcement of Defendant Martin's sudden and immediate departure as well as her large and unusual severance drew the attention of analysts.  Omotayo Tejumade Okusanya, an analyst with Jefferies LLC, noted "[t]here's a little bit of surprise that she'll get this big of a severance package . . . that raises some corporate governance issues."[2]

71.     The timing of Defendant Martin's sudden resignation and departure from the Company is suspicious at best, occurring shortly after the truth regarding ManorCare's billing

---

[2] Mary Kate Nelson, *HCP Targets REIT Rebirth Following CEO Exit*, SENIOR HOUSING NEWS (July 12, 2016), http://seniorhousingnews.com/2016/07/12/fresh-start-for-hcp-following-ceo-exit/.

fraud was revealed.   Moreover, her departure took place merely three months before her employment contract with HCP was due to expire.

72.     The actions taken by Defendants have harmed and continue to harm the Company.   In sum, the true facts, which Defendants knew or recklessly disregarded, but misrepresented or concealed from investors and the public, were that: (i) ManorCare was engaged in insurance fraud, in violation of both federal and state law; (ii) ManorCare's reported revenue and earnings were falsely stated due to the fraudulently-obtained reimbursements; (iii) ManorCare's consolidated financial statements were not in compliance with GAAP; and (iv) ManorCare's billing fraud and the DOJ's action against ManorCare put the Company's lease revenue stream from ManorCare in jeopardy, and called into question the value of HCP's ManorCare real estate assets and HCP's equity stake in ManorCare.

## DUTIES OF THE DEFENDANTS

73.     As officers and directors of the Company, the Defendants had the ability to control the business and corporate affairs of HCP and owe the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care. The Defendants were and are required to use their utmost ability to control and manage HCP to operate in a legal and honest fashion. The Defendants were and are required to act in furtherance of the best interests of HCP and its shareholders to benefit all shareholders.

74.     Each director and officer of the Company owes to HCP and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

75.     In addition, as officers and/or directors of a publicly held company, the

Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's financial and business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

76.     The Defendants, because of their positions of control and authority as directors and/or officers of HCP, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the public statements issued by HCP.

77.     Because of their advisory, executive, managerial and directorial positions with HCP, each of the Defendants had a duty to know of and understand the basic business of the Company such that they knew of the true business and prospects of the Company and related that information correctly and accurately to the Company's investors and potential investing public.

78.     Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of HCP were required to, among other things:

> a. Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;
>
> b. Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;
>
> c. Properly and accurately guide investors and analysts as to the true financial and business prospects of the Company at any given time, including making

accurate statements about the Company's business and financial prospects and internal controls;

d.  Remain informed as to how HCP conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

e.  Ensure that HCP was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

79.  Furthermore, the Board of Directors adopted an Audit Committee Charter, last revised as of October 24, 2013, with the purpose of assisting the Board in its oversight duties, accounting and reporting practices, and the adequacy of the Company's financial and accounting policies, among other duties. The Audit Committee Charter provides additional duties with respect to the Audit Committee members, consisting of Defendants Cartwright, Garvey, Hoffman, and Rhein (collectively, the "Audit Committee Defendants").   The additional responsibilities include, *inter alia*:

A.  Discuss with management and the independent auditor the Company's earnings press releases as well as financial information and earnings guidance provided to analysts and rating agencies. The Committee's discussion in this regard may be general in nature (i.e., discussion of the types of information to be disclosed and the type of presentation to be made) and need not take place in advance of each earnings release or each instance in which the Company may provide earnings guidance.

B.  Discuss with management and the independent auditor: (i) major issues

regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles; (ii) the yearly report prepared by management, and attested to by the independent auditor, assessing the effectiveness of the Company's internal control over financial reporting and stating management's responsibility for establishing and maintaining adequate internal control over financial reporting prior to its inclusion in the Company's Annual Report on Form 10-K, and any major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies; (iii) any analyses prepared by management or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including analyses of the effects of alternative GAAP methods on the Company's financial statements; and (iv) the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the Company's financial statements.

C.     The Committee shall review and discuss the quarterly financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

D.     The Committee shall discuss with the Company's General Counsel or outside counsel **any legal matters brought to the Committee's attention that could reasonably be expected to have a material impact on the Company's financial statements.**

## BREACHES OF DUTIES

80.     Each Defendant, by virtue of his or her position as a director and/or officer, owed to HCP and its shareholders the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of HCP, as well as in the use and preservation of its property and assets. The conduct of the Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of HCP, the absence of good faith on their part, and a reckless disregard for their duties to HCP and its shareholder that the Defendants were aware or should have been aware posed a risk of serious injury to HCP.

81.     The Defendants each breached their duties of loyalty and good faith by allowing Defendants to cause, or by themselves causing, the Company to make false and/or misleading statements that misled shareholders into believing that disclosures related to the Company's financial and business prospects were truthful and accurate when made.

82.     Due to Defendants' illegal actions and course of conduct, the Company is now the subject of a securities class action that alleges violations of the federal securities laws and will cause the Company to expend significant sums of money for the defense and potential settlement of the lawsuit.

83.     In committing the wrongful acts alleged herein, the Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

84.     During all times relevant hereto, the Defendants collectively and individually initiated a course of conduct that was designed to mislead shareholders into believing that the

Company's business and financial prospects were better than they actually were. In furtherance of this plan, conspiracy, and course of conduct, the Defendants collectively and individually took the actions set forth herein.

85.    The purpose and effect of the Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Defendants' violations of law, including breaches of fiduciary duties; and (b) disguise and misrepresent the Company's actual business prospects.

86.    Defendants knowingly permitted and participated in the release of improper statements. Because the actions described herein occurred under the authority of the Board, each of the Defendants was a direct, necessary and substantial participant in the conduct complained of herein.

87.    Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## DAMAGES TO THE COMPANY

88.    The Company has been, and will continue to be severely damaged and injured by Defendants' misconduct.  Such harm includes, but is not limited to:

      a.    Costs incurred in compensation and benefits paid to defendants that breached their duties to the Company;

      b.    Substantial loss of market capital;

      c.    Costs already incurred defending against the pending Securities Action, and

potential liability therefrom; and

    d.  The Company's business, goodwill and reputation with its business partners, regulators, and shareholders have been gravely impaired.

89.    The actions complained of herein have irreparably damaged HCP's corporate image and goodwill. For at least the foreseeable future, HCP will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that HCP's ability to raise equity capital or debt on favorable terms in the future is now impaired.

### DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

90.    Plaintiff brings this action derivatively in the right and for the benefit of HCP to redress injuries suffered, and to be suffered, by HCP as a direct result of Defendants' breaches of fiduciary duties and unjust enrichment. HCP is named as a nominal defendant solely in a derivative capacity.

91.    Plaintiff will adequately and fairly represent the interests of HCP in enforcing and prosecuting its rights and was a shareholder of HCP common stock at the time of the wrongdoing of which Plaintiff complains and has been continuously since.

92.    At the time this action was commenced, the Board of HCP consisted of the following eight directors: Defendants Mckee, Herzog, Cartwright, Garvey, Henry, Hoffman, Rhein, and Sullivan.

93.    Plaintiff did not make a pre-suit demand on the Board to pursue this action, because such a demand would have been a futile and wasteful act for reasons detailed below.

### Defendant Herzog is Not Independent as the Company's CEO

94.    Defendant Herzog has been a CEO and a director of the Company since January

2017.  Prior to his appointment as CEO and director, Herzog served as the Company's Chief Financial Officer from June 2016 through December 2016.  Upon information Herzog receives a substantial annual base salary from the Company, representing the primary source of his income. Defendant Herzog has derived significant income from, and his primary source of income was, his employment as Chief Financial Officer of HCP, and as such, his reputation is inextricably bound to his role at HCP.  As a result of his role as an executive officer of the Company, Defendant Hayes is not independent and therefore cannot independently consider any demand to sue himself for breaching his fiduciary duties to HCP, as that would expose him to liability and threaten his livelihood.

**The Members of the Compensation Committee – Defendants Garvey, Henry, Rhein, and Sullivan – Have Demonstrated by Their Actions that they Are Non-Impartial**

95.     On July 12, 2016, the Company announced that Defendant Martin had resigned as Company CEO and director, without stating any reason for the resignation.

96.     Demand is futile as to the members of the Compensation Committee – Defendants Garvey, Henry, Rhein, and Sullivan (the "Compensation Committee Defendants") – because they demonstrated themselves to be partial in favor of Defendant Martin by authorizing the wrongful payment of over $6 million to Defendant Martin upon her termination from the Company, though Defendant Martin, who departed employment at the Company in the face of credible allegations of illegal conduct, was not entitled to severance compensation under the terms of her employment agreement.

97.     The abrupt July 11, 2016 departure from the Company of Defendant Martin, who had been on the board of HCP since 2008 and CEO since October 2013, occurred prior to the

conclusion of Martin's three-year employment contract[3] and without the Company having hired

a new CEO or Defendant Martin having securing new employment.  Neither the Company nor

Martin gave any reason for Martin's abrupt departure from employment at HCP.

98.     Pursuant to Defendant Martin's employment agreement with the Company,

Defendant Martin was only entitled to severance benefits in the event that she resigned "for good

reason" as CEO within the three-year term of the agreement.  "Good reason" is defined narrowly

in Defendant Martin's employment agreement, to include only the following reasons for

resignation:

> (A) the failure by the Company to pay Executive any portion of Executive's Base
> Salary within ten (10) days of the date such compensation is due,
>
> (B) the relocation of Executive's principal location of employment to a location
> outside of Los Angeles County or Orange County, except for required travel for
> Company business,
>
> (C) any material diminution of Executive's duties, responsibilities or authorities
> hereunder,
>
> (D) any material breach by the Company of any of its material obligations to
> Executive, or
>
> (E) any failure of the Company to obtain the assumption in writing of its
> obligations under this Agreement by any successor to all or substantially all of its
> business or assets within 30 days after any reorganization, amalgamation,
> combination, merger, consolidation, sale, liquidation, dissolution or similar
> transaction, unless such assumption occurs by operation of law.

99.     Defendant Martin, who did not state any reason at all for her departure from the

Company, failed to state any "good cause" for resignation which would have entitled her to

severance benefits under the terms of her employment agreement.

100.     Although she was not entitled to any severance benefits, Defendants gave

---

[3] Defendant Martin's employment agreement was set to run through October 2, 2016, and as
such, her departure took place within the three-year term of the agreement.

Defendant Martin approximately $6 million, in addition to other consideration and benefits including the vesting of outstanding time-based and performance-based restricted stock units ("RSUs").

101.    Upon information and belief, Defendant Martin's involvement in the above described false and misleading representations that had become the subject of the Securities Action, were the reason for Defendant Martin's separation from the Company.  That being the case, it would be far more accurate to describe Defendant Martin's departure from the company as being "for cause," rather than "for good reason."

102.    The Compensation Committee and HCP's Board of Directors falsely classified Defendant Martin's abrupt resignation as "for good reason," and under this thin pretext paid Martin over $6 million in Company money not owed to Martin.  By doing so, Defendants have demonstrated their lack of impartiality towards Defendant Martin and their inability to impartially consider taking actions against Defendant Martin for her wrongdoing.

103.    Even had there been no basis upon which to involuntarily terminate Defendant Martin, the board could have easily avoided paying her $6 million in severance benefits. Defendant Martin's employment contract ran through October 2, 2016.  Had the board left Defendant Martin in her CEO position until October 2, 2016 and terminated her the following day, there would have been no conceivable basis for a claim for severance benefits since there would have been no applicable active employment contract.

104.    The Board additionally demonstrated its partiality towards Defendant Martin by not waiting two months and two weeks for the termination, and thereby avoiding paying Defendant Martin over $6 million in shareholder funds.

105.    Having already rewarded Martin for her wrongdoing by paying her over $6

million, without any conceivable justification, Defendants are highly unlikely to or incapable of, impartial consideration of any claims against or related to Defendant Martin and her associated conduct alleged herein.  The Compensation Committee Defendants and the other director Defendants who approved the Compensation Committee's grant of separation benefits to Defendant Martin, have rewarded Defendant Martin for her wrongful conduct by giving her over $6 million in compensation she was not owed.  Having lavishly rewarded Defendant Martin for the circumstances that led to her resignation from the Company, Defendants have made a determination, without a special committee, as to Defendant Martin's lack of culpability in the above described false and misleading statements.  Accordingly, Defendants can hardly now be expected to impartially consider taking action against Defendant Martin for the same conduct or any claims associated therewith.[4]

106.    The Compensation Committee Defendants and entire Board of Directors are interested and have demonstrated that they are unwilling to impartially assess the expeditiousness of an action against Defendant Martin.  For this reason, any demand upon the Director Defendants to institute legal action on behalf of the Company to recoup payments made to Defendant Martin is futile.

**The Audit Committee Members, Defendants Cartwright, Garvey, Hoffman, and Rhein, are Non-Impartial because They Face a Sufficiently Substantial Likelihood of Liability**

107.    Demand is futile as to Defendants Audit Committee members Cartwright, Garvey, Hoffman, and Rhein (collectively, the "Audit Committee Defendants"), due to their knowledge of the true condition of the Company's ManorCare investments which they received and

---

[4] The First, Second, Third, Fourth, Sixth, and Seventh Causes of Action are all related as they stem from the rampant insurance fraud alleged herein, specifically Defendant Martin's involvement in the filing of financial statements which contained misrepresentations or omissions of material fact concerning the insurance fraud scheme.

reviewed in their capacity of Audit Committee members, and which put them on notice of the systemic fraudulent practices ManorCare was engaged in.

108.    The Audit Committee Charter, last updated on October 24, 2013, the purpose of the Company's Audit Committee is to "assist the Board with its oversight responsibilities regarding: (i) the integrity of the Company's financial statements and internal controls over financial reporting; (ii) the Company's compliance with legal and regulatory requirements; (iii) the independent auditor's qualifications and independence; (iv) the performance of the Company's internal audit function and independent auditor; and (v) the Company's risk management. The Committee shall prepare the report required by the rules of the Securities and Exchange Commission (the "SEC") to be included in the Company's annual proxy statement."

109.    Upon information and belief, in their capacity as members of the Audit Committee, the Audit Committee Defendants were privy to specific information related to the Company's ManorCare investments, which would reasonably put them on notice of the fraudulent practices ManorCare was engaged.

110.    HCP's filings with the SEC concerning the Company's business and prospects moving forward throughout the Relevant Period contained materially misleading information and/or omitted material information concerning the true nature of the Company's financial stability, or lack thereof.  In their capacity as members of the Audit Committee, the Audit Committee Defendants were charged with ensuring that these reports did not contain such materially misleading information. By allowing documents to be filed with misleading information, the Audit Committee Defendants face a sufficiently significant likelihood of liability so as to render them interested.  Accordingly, the Audit Committee Defendants cannot adequately independently consider a demand.

**Demand is Futile as to the Entire Board Because Each Faces a Sufficiently Substantial
Likelihood of Liability Due to their Positions as Board Members During the Alleged
Wrongful Conduct**

111.     Any demand upon the director Defendants would be a futile and useless act as
they have served as directors of the Company during some or all the wrongdoing alleged herein
from March 30, 2015 through present, and each faces a substantial likelihood of liability for their
participation in the illicit acts alleged herein.  This was in violation of (among other things) the
Defendants' fiduciary duties of good faith and loyalty.

112.     Upon information and belief, in their capacity as members of the Company's
Board, the director Defendants were privy to specific information related to the Company's
ManorCare investments, which would reasonably put them on notice of the fraudulent practices
ManorCare was engaged in.

113.     Accordingly, the director Defendants face a sufficiently substantial likelihood of
liability in connection with the false and misleading statements detailed above, and as a result
cannot possibly consider a demand to sue themselves.

## FIRST CAUSE OF ACTION

### Against all Defendants for Breach of Fiduciary Duties

114.     Plaintiff incorporates by reference and realleges each and every allegation
contained above, as though fully set forth herein.

115.     The Defendants owed and owe HCP fiduciary obligations. By reason of their
fiduciary relationships, the Defendants owed and owe HCP the highest obligation of good faith,
loyalty, and due care.

116.     The Defendants have violated and breached their fiduciary duties of good faith,
loyalty, and due care by causing or allowing the Company to disseminate to HCP shareholders

materially misleading and inaccurate information through the Company's SEC filings throughout the Relevant Period. These actions could not have been a good faith exercise of prudent business judgment.

117. During the course of the discharge of their duties, Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants caused HCP to engage in the conduct complained of herein which they knew had an unreasonable risk of damage to the Company, thus breaching their duties owed to HCP and its shareholders. As a result, Defendants grossly mismanaged the Company.

118. As a direct and proximate result of the Defendants' failure to perform their fiduciary obligations, HCP has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

119. Plaintiff, on behalf of HCP, has no adequate remedy at law.

## SECOND CAUSE OF ACTION

### Against all Defendants for Unjust Enrichment

120. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

121. By their wrongful acts and omissions, the Defendants were unjustly enriched at the expense of and to the detriment of HCP.

122. The Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to HCP.

123. Plaintiff, as a shareholder and representative of HCP, seeks restitution from the Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct and fiduciary breaches.

34

124.    Plaintiff, on behalf of HCP, has no adequate remedy at law.

## THIRD CAUSE OF ACTION

### Against all Defendants for Abuse of Control

125.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

126.    The Defendants have taken advantage of their positions as officers and/or directors of the Company to the detriment of HCP and the investing public by causing the Company to release false and misleading information that would artificially inflate the price of the Company's stock while hiding the true prospects of ManorCare's fraud and its value to the Company as a result.

127.    As such, the Defendants have abused their positions of control with the Company and are legally responsible.

128.    Thus, for the aforementioned reasons, the Defendants are liable to the Company for their wrongdoing.

## FOURTH CAUSE OF ACTION

### Against all Defendants for Gross Mismanagement

129.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

130.    Defendants owed a duty of oversight to the Company in which they were responsible to ensure that the Company maintained adequate reporting controls for all financial, accounting and disclosure released by the Company. Furthermore, the Defendants were responsible to oversee, manage and control the operations of the Company, including the manners and methods of reporting in which the acts complained herein occurred.

131.    Through the wrongful acts complained of herein, the Defendants refused or did not properly discharge their responsibilities to the Company and its shareholders in a prudent manner as prescribed by law as well as in the Company's corporate governance regulations.

132.    By committing the misconduct alleged herein, Defendants breached their fiduciary duties of due care, diligence and candor in the management and administration of HCP's affairs and in the use and preservation of HCP's assets.

133.    During the course of the discharge of their duties, Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants caused HCP to engage in the conduct complained of herein which they knew had an unreasonable risk of damage to HCP, thus breaching their duties to the Company.

134.    As a result, Defendants grossly mismanaged HCP and should be liable to the Company for the resulting damages.

## FIFTH CAUSE OF ACTION

### Against Defendants Garvey, Henry, Rhein, and Sullivan for Corporate Waste

135.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

136.    As alleged herein, Defendants Garvey, Henry, Rhein, and Sullivan, as members of the Compensation committee, caused the Company to pay Defendants Martin excessive and unwarranted severance compensation.  In exchange for the excessive and improper compensation, the Company received no consideration or consideration so disproportionality small as to lie beyond the range at which any reasonable person might be willing to trade or conduct a business transaction.

137.    By approving and causing the Company to pay the improper severance

compensation, Defendants Garvey, Henry, Rhein, and Sullivan wasted the Company's assets.

138.     As a direct and proximate result of Defendants Garvey, Henry, Rhein, and Sullivan's waste of corporate assets, the Company has sustained damages.

## SIXTH CAUSE OF ACTION

### Against ManorCare for Aiding and Abetting

139.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

140.     Defendant ManorCare aided and abetted the wrongful acts described herein because it actively engaged in fraudulent schemes to over-treat patients and overcharge Medicare, as described above, as well as reported false financial figures.

141.     ManorCare knew that the financial figures it provided to the Company were false and misleading.

142.     As a result of the misconduct alleged herein, ManorCare is liable for the damages it caused through its fraudulent conduct.

143.     Plaintiff, on behalf of HCP, has no adequate remedy at law.

## SEVENTH CAUSE OF ACTION

### Against all Defendants for Violations of Section 14(a) of the Securities Exchange Act of 1934 and Rule 14a-9 Promulgated Thereunder

144.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

145.     Rule 14a-9, promulgated pursuant to §14(a) of the Securities Exchange of 1934, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein

not false or misleading." 17 C.F.R. §240.14a-9.

146.    Specifically, the Company's 2016 Proxy violated §14(a) and Rule 14a-9 because it omitted material information regarding the wrongdoing of Defendants and their involvement in the rampant insurance fraud scheme as alleged herein.  As set forth herein, Defendants, in the 2016 Proxy, stated that "our overall 2015 results generally improved year over year but did not meet original performance expectations, primarily due to the impact of the Company's lease restructure transaction with [ManorCare] in March 2015. As a result of lower Company performance levels for 2015, our CEO's total compensation as reported in the Summary Compensation Table was lower for 2015 than for 2014 . . . ."[5]  The proceeding statement was false because the 2016 Proxy failed to disclose that a large part of the performance issues directly resulted from the rampant insurance fraud occurring at ManorCare, and the associated DOJ and whistleblower actions.

147.    The insurance fraud at ManorCare and associated lawsuits would result in the Company having to write down its ManorCare investments by $1.3 billion throughout the course of the Relevant Period, with the Company ultimately disclosing that its investment had been written down to zero and that it could no longer rely on ManorCare to pay rent, a significant impact given that 30% of the Company's revenue was derived from its ManorCare lease assets.

148.    In the exercise of reasonable care, Defendants should have known that the 2016 Proxy contained materially misleading information and/or omitted material information.

149.    The misrepresentations and omissions in the 2016 Proxy were material to Company shareholders in voting on the 2016 Proxy, as it made the Company appear to be in a more stable financial condition that it in fact was.

_____

[5] Form DEF 14A, filed with the SEC on Mar. 17, 2016, at 30.

150.     The Company was damaged as a result of the Defendants' material misrepresentations and omissions in the 2016 Proxy.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A.     Against all Defendants for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties, aiding and abetting breaches of fiduciary duties and unjust enrichment;

B.     Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect HCP and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and committee charters taking such other actions as may be necessary to place before shareholders for a vote the following corporate governance proposals or policies:

- A proposal to strengthen the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

- A proposal to strengthen the Company's internal reporting and financial disclosure controls;

- A proposal to develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

- A proposal to ensure the accuracy of the qualifications of HCP's directors, executives and other employees;

- A proposal to require an independent Chairperson of the Board;

- A provision to appropriately test and then strengthen the Company's internal operational control functions;

C.     Awarding to HCP restitution from the Defendants, and each of them, and

ordering disgorgement of all profits, benefits and other compensation obtained by the Individual

Defendants;

       D.       Awarding to Plaintiff the costs and disbursements of the action, including

reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

       E.       Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff, by and through its counsel of record, requests a jury for all issues triable in the

above-referenced matter.


Dated: April 10, 2017                 Respectfully submitted,

                                      **STRAUSS TROY CO., LPA**


                                      /s/ Richard S. Wayne
                                      Richard S. Wayne (0022390)
                                      Thomas P. Glass (0062382)
                                      150 East Fourth Street
                                      Cincinnati, Ohio  45202
                                      Telephone:  (513) 621-2120
                                      Facsimile: (513) 629-9426
                                      rswayne@strausstroy.com
                                      tpglass@strausstroy.com


                                      **LIFSHITZ & MILLER LLP**
                                      Joshua M. Lifshitz
                                      Edward W. Miller
                                      821 Franklin Avenue, Suite 209
                                      Garden City, NY 11530
                                      Telephone: (516) 493-9780


                                      *Attorneys for Plaintiff*

12109577_1.doc